UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDDIE WAGLE,

                Plaintiff,                            Case No. 19-13787

v.                                           HON. MARK A. GOLDSMITH

CORIZON, et al.,

                Defendants.

_____/

## OPINION & ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 69)

This matter is before the Court on the motion for summary judgment filed by Defendants Shay Sattler and Jennifer Magda. For the reasons that follow, the Court grants the motion.[1]

### I. BACKGROUND

Plaintiff Eddie Wagle is a prisoner in the custody of the Michigan Department of Corrections (MDOC). Compl. ¶ 4 (Dkt. 1). He brings this 42 U.S.C. § 1983 action against employees and a contractor of the MDOC, alleging that they violated his Eighth Amendment rights by failing to provide him treatment for a concussion that he sustained after he was in a fight with two other prisoners at Michigan's G. Robert Cotton Correctional Facility. Id. ¶¶ 12, 45–56; Resp. at 1–2. Defendants Shay Sattler, a registered nurse, and Jennifer Magda, a licensed practical nurse (LPN), are former MDOC employees who worked at the facility. Mot. at PageID.430.

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Plaintiff Eddie Wagle's response (Dkt. 74), his supplemental exhibit in support of that response (Dkt. 81), and Defendants' reply (Dkt. 75).

At around 1:40 p.m. on March 5, 2019, Wagle was involved in a fight with two other prisoners, Milton and Barber.  Wagle Dep. at 16 (Dkt. 69-2); MDOC Incident Report (Dkt. 69-5).  An MDOC incident report described video footage of the fight:

> Prisoners Wagle . . . and Barber . . . stood talking with one other prisoner.  At 13:40:03, Wagle punched Barber in the head.  Barber then charged toward Wag[ ]le and punched him two times.  The incident appeared to be over, but then Prisoner Milton . . . came running across the yard at Wagle.  Milton started striking Wagle, and Barber then joined in and struck Wagle hard enough to knock all three of them over in a pile.  Milton then held Wagle down while Barber kicked him in the face.

MDOC Incident Report at 3.

MDOC officers stopped the fight, and Lieutenant Muzzin escorted Wagle to the prison's healthcare unit to be evaluated.  Wagle Dep. at 17; Resp. at 15.  At 2:11 p.m., Sattler evaluated Wagle, who had a "bump under [his] eye" and "little bumps and nicks and stuff."  Wagle Dep. at 17–18; Sattler Nurse Protocol (Dkt. 69-6).  Sattler asked him if he was in pain, and he told her that his face was sore; his nose hurt; and he was getting a headache.  Wagle Dep. at 17.  She also asked if he lost consciousness, and he said that he did not know.  Id.  In her documentation of the visit, Sattler noted that Wagle's chief complaint was "integumentary."[2]  Sattler Nurse Protocol.  Wagle had his vital signs taken.  Id.  Sattler cleaned the affected area, applied dressings, and provided Wagle patient education.  Id.  Wagle estimates that this interaction lasted about five to ten minutes.  Wagle Dep. at 52.

After he left the healthcare unit, Wagle was taken to a temporary segregation unit.  Id. at 19.  About two hours later, he was taken to the regular segregation unit, rather than being released to

---

[2] "[The] integumentary system is [the] body's outer layer" and consists of the hair, skin, and nails. Cleveland Clinic, Integumentary System (April 25, 2022), https://my.clevelandclinic.org/health/body/22827-integumentary-system.

the general population, because he had been issued a misconduct ticket for fighting.  Id.  He was to be held in the regular segregation unit until after a hearing on the misconduct ticket.  Id.

Wagle is diabetic, and he takes insulin every morning, every evening, and sometimes at lunch depending on his blood sugar.  Id. at 15.  He also takes blood pressure medication to prevent high blood pressure.  Id. at 10.  Wagle asserts that on the evening of March 5, 2019, Magda stopped by his cell in the regular segregation unit to deliver his medication.  Id. at 52; see also Compl. ¶ 18.  At the time, his left eye was purple and almost swollen shut.  Wagle Dep. at 52.  Wagle states that he told Magda that he had been "beat up by a couple of guys earlier today" and that his face hurt, that he felt dizzy, and that he "didn't feel right."  Id. at 22.  He asserts that in response, Magda told him to send a kite to healthcare.[3]  Id. at 22–23.  This interaction lasted a few minutes.  Id. at 24.

On the morning of March 6, 2019, an MDOC employee called for Wagle to come to his cell door and get his insulin.  Id. at 10, 11, 15.  Wagle stood up, "passed out," and hit the left side of his face on a sink in his cell.  Resp. at 13.

He was transported to a hospital by ambulance.  Id. at 16.  An emergency medical services patient care report noted that Wagle's chief complaints were syncope, meaning fainting; neck pain; and dizziness.  Id. at 17.  A report prepared by one of the paramedics who arrived at the prison to transport Wagle stated that Wagle's left eye and the left side of his face were swollen, that he had abrasions[4] on his face, and that he had a contusion[5] and abrasion(s) on his head.  Id. at 16.

---

[3] A "kite" is "a form that allows inmates to communicate and get information about just about anything, including court dates, visitors, lawyers' information, requests, complaints, or medical assistance."  Meirs v. Ottawa Cnty., 821 F. App'x 445, 448 n.1 (6th Cir. 2020) (punctuation modified).

[4] An abrasion is a "scraping or rubbing away of the skin."  Harvard Health Publishing, Medical Dictionary of Health Terms (2023).

[5] A contusion is a bruise.  Harvard Health Publishing, Medical Dictionary of Health Terms (2023).

According to the report, after Wagle fell, staff in the healthcare unit checked his blood sugar, which was 265.[6]  In addition, the report noted that Wagle's mental status and neurological status were "normal baseline."  Id.

At the hospital, Wagle had a CT scan, and he was diagnosed with multiple fractured facial bones and vertebral artery dissection.[7]  Id. at 35.  On March 11, 2019, he had facial reconstruction surgery to treat the fractures.  Id.

Wagle reports that since his fall, he has suffered nerve damage in his face, balance issues, and pain and that he uses a cane.  Id. at 8; Wagle Dep. at 34.

Wagle alleges that he sustained a concussion because of the fight that he was in on March 5, 2019 and that he fell on March 6 in part because of the concussion.  Wagle Dep. at 28; Resp. at 2, 13.  He alleges that Sattler and Magda were deliberately indifferent to his serious medical needs because they failed to provide treatment for his concussion.  See Compl. ¶¶ 47–51, 54; see also Resp. at 3; Wagle Dep. at 28.  Regarding Sattler's conduct, he asserts that she "should have known by the injuries presented and [his] statement that he may have had a possible concussion and other possible head injuries that required medical attention that was beyond her training," but she failed to ensure that he was evaluated by a physician to determine if he needed further treatment and failed to place him under observation.  Compl. ¶¶ 48–50.  Regarding Magda's conduct, he asserts that she did not place him under observation or evaluate him when he told her that he was in pain and did not feel right.  Id. ¶ 54.

---

[6] Wagle testified that, while he has been told that normal blood sugar is between 78 and 120, he feels better when his blood sugar is around 150.  Wagle Dep. at 11.

[7] Vertebral artery dissection occurs when a tear forms in one of the blood vessels that runs up the back of the neck.  Cleveland Clinic, Vertebral Artery Dissection (2022), https://my.clevelandclinic.org/health/diseases/23961-vertebral-artery-dissection.

## II. ANALYSIS[8]

Defendants argue that they are entitled to summary judgment in part because Wagle cannot satisfy either the objective or subjective component of his Eighth Amendment claims against them. Mot. at PageID.442–450. The Court first discusses these components of an Eighth Amendment claim and then examines how they apply to Wagle's claims. It finds that Wagle has not presented sufficient evidence to support a finding that he had an objectively serious medical condition at the time Defendants evaluated him or that Defendants were subjectively aware of and consciously disregarded a serious medical need.

### A. Eighth Amendment Claim

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 895 (6th Cir. 2004) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To establish a prison official's deliberate indifference to a serious medical need, a plaintiff must show two components, one objective and one subjective. Rhinehart v. Scutt, 894 F.3d 721, 737 (6th Cir. 2018). "The plaintiff must show both that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and that the official acted with a culpable enough state of mind, rising above gross negligence." Id. The issue of whether a prison official was deliberately indifferent is a mixed issue of law and fact.

---

[8] In assessing whether Defendants are entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

Williams v. Mehra, 186 F.3d 685, 690 (6th Cir. 1999) (explaining that questions about what actions defendants performed are questions of fact, and the question of the legal standard for deliberate indifference is a question of law).  Resolving this issue requires the court to compare defendants' conduct with the legal standard of deliberate indifference.  Id.

### 1.  Objective Component

The objective component of a deliberate indifference claim asks whether a plaintiff faced a "risk of sufficiently serious harm."  Phillips v. Tangilag, 14 F.4th 524, 534 (6th Cir. 2021).  To prove this objectively serious harm in the healthcare context, a plaintiff must first establish that he or she has "serious medical needs."  Id.  A plaintiff can do so in one of two ways.  Blosser v. Gilbert, 422 F. App'x 453, 460 (6th Cir. 2011).  The first is by "showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care."  Phillips, 14 F.4th at 534.  If the prison "failed to provide treatment" or "provided treatment so cursory as to amount to no treatment at all," Rhinehart, 891 F.3d at 737, "a serious medical need alone can satisfy this objective element."  Phillips, 14 F.4th at 534.

The second method of establishing a serious medical need applies when the plaintiff's "affliction is seemingly minor or non-obvious" or when the plaintiff was provided some care and challenges the treatment choices as inadequate.  Blackmore, 390 F.3d at 899.  In those instances, the seriousness of the medical need is evaluated under a different standard: the effect of delay in treatment.  Id.; Anthony v. Swanson, 701 F. App'x 460, 463 (6th Cir. 2017).  The United States Court of Appeals for the Sixth Circuit has generally held that the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment."  Santiago v. Ringle, 734 F.3d 585, 591 (6th Cir. 2013) (punctuation modified)

("[M]edical proof is necessary to assess whether the delay caused a serious medical injury."); see also Phillips, 14 F.4th at 534 (explaining that, for prisoners to prevail on a claim alleging inadequate care, "courts generally require them to introduce medical evidence"). This type of medical proof "often require[s] expert testimony showing the medical necessity for the desired treatment and the inadequacy of the treatments the [plaintiff] received." Rhinehart, 891 F.3d at 737–738 (punctuation modified); see also Anthony, 701 F. App'x at 464 (noting that expert medical testimony can come in the form of an affidavit or depositions). But "evidence in a prisoner's medical records can suffice in some cases." Est. of Majors v. Gerlach, 821 F. App'x 533, 540 (6th Cir. 2020). A plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm that the allegedly inadequate treatment caused. Rhinehart, 891 F.3d at 737.

### 2. Subjective Component

The subjective component of an Eighth Amendment deliberate indifference claim asks whether prison officials knew of and disregarded the plaintiff's serious medical need. Phillips, 14 F.4th at 535. To satisfy this component, a plaintiff must demonstrate that the defendant had "a sufficiently culpable state of mind in denying medical care." Blackmore, 390 F.3d at 895. A defendant has a sufficiently culpable state of mind if he or she "knows of and disregards an excessive risk to inmate health or safety." Winkler v. Madison Cnty., 893 F.3d 877, 891 (6th Cir. 2018). In the healthcare setting, this means that the defendant "must first know of the facts that show the serious medical need and must personally conclude that this need exists." Phillips, 14 F.4th at 535. The defendant's response must then "consciously disregard" the need. Id. (punctuation modified). Courts have stated that this standard is equivalent to criminal recklessness. Id.; Santiago, 734 F.3d at 591. Thus, it entails something more than mere negligence but something less than specific

intent to harm or knowledge that harm will result. Burwell v. City of Lansing, Mich., 7 F.4th 456, 465 (6th Cir. 2021). When a plaintiff has received some medical treatment, and the dispute is over the adequacy of the treatment, "courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Burgess v. Fischer, 735 F.3d 462, 476 (6th Cir. 2013) (punctuation modified). A plaintiff may prove subjective knowledge by using circumstantial evidence, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Rouster v. Cnty. of Saginaw, 749 F.3d 437, 447 (6th Cir. 2014) (punctuation modified).

**B. Wagle's Claim**

Defendants argue that there is no evidence that, at the time they interacted with him, Wagle had an objectively serious medical need or that they knew of and disregarded a risk of serious harm to him. Mot. at PageID.442–450. The Court discusses the objective and subjective components of Wagle's claim in turn. It finds that Wagle has not created a triable issue as to either component.

**1. Objective Component**

To survive summary judgment, Wagle must first point to evidence in the record that shows an objectively serious medical need. Defendants assert that Wagle cannot establish that he had an objectively serious medical need because (i) he cannot show that any injury was serious or obvious at the time they saw him, and (ii) if his injury was non-obvious, he has not entered verifying medical evidence in the record to show a detrimental effect of a delay in treatment. Id. at PageID.442, 445–448. The Court agrees.

**a. Obvious Medical Need**

In his response, Wagle argues that he had a serious medical need because he had a concussion, which he sustained during the fight on March 5, and that he displayed obvious signs and symptoms

of a concussion to Sattler and Magda.  See Resp. at 1–4.  He also argues that he was provided no treatment for his concussion or treatment so cursory that it amounted to no care at all.  Id. at 3–4.

The evidence, however, does not his support his assertion that he displayed obvious indications of a concussion to Sattler or Magda, and the record shows that he received non-cursory medical treatment promptly after the fight for visible external injuries.  See Santiago, 734 F.3d at 590 (assessing the medical need that the plaintiff experienced at the time defendants took the challenged actions).

Sattler evaluated Wagle about 30 minutes after the fight.  MDOC Incident Report (stating that fight occurred at 1:40 p.m.); Sattler Nurse Protocol (reporting that Sattler saw Wagle at 2:11 p.m.).  According to Wagle's testimony, when he saw Sattler, he had a "bump under [his] eye" and "little bumps and nicks and stuff."  Wagle Dep. at 17–18.  He told Sattler that his face was sore, that his nose hurt, and that he was getting a headache.  Id. at 17.  In addition, Wagle testified that when Sattler asked if he lost consciousness, he informed her that he did not know.[9]  Wagle does not demonstrate why it would be obvious that he needed to be treated for a concussion based on these symptoms.  It is also undisputed that Sattler cleaned the affected area, applied dressings, and provided Wagle patient education.

---

[9] Wagle states in his response that he was "knocked unconscious" during the fight.  Resp. at 2.  This account of events contradicts his deposition testimony, in which he stated he did not know whether he lost consciousness.  See Wagle Dep. at 17–18.  "It is accepted that 'a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.'"  Trs. of Plumbers & Steamfitters Loc. Union No. 43 Health & Welfare Fund v. Crawford, 573 F. Supp. 2d 1023, 1034 (E.D. Tenn. 2008) (quoting Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999)).  Wagle offers no explanation for the contradiction, so his later statement cannot create a factual dispute that he displayed obvious signs of a concussion.

Wagle testified that, later that day, he presented to Magda with a purple and swollen left eye and told Magda that he had been "beat up by a couple of guys earlier today" and that his face hurt, that he felt dizzy, and that he "didn't feel right." Id. at 22.

Defendants note, however, that Magda was not at the prison on the evening of March 5, 2019 and left work at 2:46 p.m. that day, so she could not have identified a serious medical need on the grounds presented by Wagle. Mot. at PageID.439–440, 446–447 (citing Magda Timecard (showing that Magda left the prison at 2:46 p.m. on March 5 and did not return that same day) (Dkt. 69-7)). In contrast to Wagle's story, Defendants maintain that Magda assessed Wagle at the same time as Sattler. Id. (citing Magda Nurse Visit (Dkt. 69-3)). A medical record created by Magda supports this assertion, as it shows that she saw Wagle at 2:11 p.m. on March 5—the same time that Sattler evaluated him. See Magda Nurse Visit (stating that visit occurred at 2:11 p.m., listing Wagle's medications, and documenting his vital signs as of 2:12 p.m.).

Wagle seems to acknowledge that it is possible he misidentified the individual with whom he interacted on the evening of March 5. See Resp. at 4–5. He states, however, that any misidentification was due to the fact that, when he requested from MDOC the names of people who evaluated his condition on March 5 and who administered his insulin that evening, he was provided with two names: Sattler and Magda. Id. at 5; see also id. at 27, 30 (showing that MDOC provided Wagle with the names of Sattler and Magda in response to his request).

It is irrelevant which version of history is accurate. Regardless of whether Magda saw Wagle at the same time as Sattler or interacted with him on the evening of March 5—and regardless of whether Wagle misidentified Magda—he does not show why the symptoms he displayed at those two times made it obvious that he needed treatment for a concussion.

Other evidence that Wagle cites in his response is likewise insufficient to create a genuine factual dispute that he displayed obvious indications of a concussion.  For example, he relies on the incident report's description of the video footage of the fight.  Id. at 2.  But the incident report does not describe the injuries that he sustained, his condition at the time that Sattler and Magda saw him, what injuries Sattler and Magda observed, or what he told them about the incident.

Further, Wagle states that Sattler's documentation shows that he had elevated blood pressure about a half hour after the fight, which "is direct evidence that [he] was in pain and/or that he was suffering from some other medical condition."  Id. at 3.  Wagle does not support his assertion that high blood pressure would indicate that he was suffering from a concussion.  And, as Defendants note, Wagle takes blood pressure medication, and he offers no evidence to support his allegation that his blood pressure as recorded by Sattler after the fight was higher than his blood pressure typically is.

 Moreover, the foundation for Wagle's claim is not that Defendants were deliberately indifferent because they did not treat his high blood pressure or "some other serious medical need," Resp. at 3, but rather that they were deliberately indifferent because they did not treat his alleged concussion.  See Compl. ¶ 48 ("Defendant [Sattler] should have known by the injuries presented and Plaintiff's statement that he may have had a possible concussion and other possible head injuries that required medical attention that was beyond her training"); Wagle Dep. at 28 (stating that defendants failed to diagnose or treat his concussion, which caused him to fall); Resp. at 2–3 (alleging that he presented to Sattler and Magda with apparent signs of a concussion and that they "failed to provide any medical assistance when there was an obvious need for it").

In addition, Wagle relies on two other kinds of evidence referencing his injuries to support his contention that he displayed "clear indications of possible internal injuries, i.e., a concussion."

Resp. at 2.  Wagle points to statements of Lieutenant Muzzin as one source of evidence.  When Lieutenant Muzzin escorted Wagle to the healthcare unit after the fight, she told him that he looked "rough," and, later, she sent an email to another prison official stating that Wagle was seen at the healthcare unit and had "injuries to his head/face."  Resp. at 2, 15.  The email provides no further detail on those injuries.  This evidence may show that a layperson knew that Wagle was injured after the fight.  But the remark and email are too vague and non-specific to create a genuine factual dispute that, at the time Sattler and Magda saw him, Wagle was showing concussive-like symptoms.  Further, as the email notes, Wagle did receive medical attention promptly after the fight.

The second source of evidence Wagle cites is a report by a paramedic who transported him to the hospital after the fall.  The report states that Wagle's left eye and face were swollen, that he had facial abrasions, and that he had a head abrasion and contusion.  Id. at 16.  It also states that Wagle's mental status and neurological status were "normal baseline."  Id.  While the report shows that Wagle's facial injuries were evident to an observer, it does not demonstrate that Wagle exhibited to Sattler and Magda symptoms indicative of a concussion, such that they were remiss in failing to diagnose, treat, or put him under observation for this condition.  The paramedic also observed Wagle after he fell and hit his face on the sink in his cell, and, therefore, the report does not necessarily indicate what Sattler and Magda would have observed when they assessed Wagle the previous day, before the fall and injuries resulting from the fall.

Wagle cannot satisfy the objective element of his deliberate indifference claim through the first option available to him—that he displayed a serious and obvious need to be treated for a concussion but was provided no treatment or what amounts to no treatment.  See Jones v. Wardlow, No. 3:08–cv–545–TLS, 2013 WL 6629334, at *2 (N.D. Ind. Dec. 17, 2013) (finding a reasonable

jury could not conclude that plaintiff, who was injured after he was attacked by other prisoners, suffered from an objectively serious medical condition when he did not "presen[t] any evidence that he was actually displaying signs and symptoms of a concussion or internal injuries" and, instead, displayed swelling, a cut on his face, and small lacerations on his head—which were "not so obviously serious that even a lay person would easily recognize the need for medical attention"); see also Estate of Clutters v. Sexton, No. 1:05cv223, 2007 WL 3244437, at *7 (S.D. Ohio Nov. 2, 2007) (finding that there was nothing obvious about the plaintiff's condition that would have indicated that his head injury needed medical treatment when prison officials testified that the plaintiff was alert after falling and hitting his head and when a paramedic testified that the cut on the back of his head stopped bleeding, the cut did not need stiches, and plaintiff was alert during his examination).

**b. Effect-of-Delay Standard**

Defendants argue that Wagle cannot satisfy the objective component of his claim under the delay-of-care standard because he has not come forward with any medical evidence suggesting that he did in fact have a concussion when they observed him or showing a detrimental effect of a delay in treatment.  Mot. at PageID.442, 445–448; Reply at 2, 4, 5–7.

As noted, when a plaintiff's injury is non-obvious or when the plaintiff challenges the treatment he or she received as inadequate, the seriousness of the medical need is evaluated by the effect of a delay in treatment.  Anthony, 701 F. App'x at 463.  While Wagle argues in his response that Defendants provided no treatment for his concussion, he also seems to allege that Defendants failed to adequately treat him.  See Resp. at 3; Compl. ¶¶ 47–51, 54.  For example, he asserts that Sattler and Magda failed to place him under observation and that Sattler failed to ensure that he was evaluated by a physician "to determine if further treatment was needed."  Compl. ¶¶ 47–51,

13

54.   Defendants also describe Wagle's claim as an adequacy of care claim.   See Mot. at PageID.443.

Because Wagle has not pointed to evidence suggesting his concussion was obvious, and because he challenges the adequacy of the care he received, in addition to stating that he received effectively no care, the second method of establishing the objective component of a deliberate indifference claim applies.   Accordingly, Wagle must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." Blackmore, 390 F.3d at 898.   As discussed, meeting this requirement for verified medical evidence requires expert medical testimony or, in some instances, evidence from a plaintiff's medical records, that would allow a reasonable jury to conclude that the plaintiff had a medical necessity for the desired treatment and that the treatment he or she received was inadequate.   Rhinehart, 891 F.3d at 737.

Wagle has not provided any medical evidence—either expert medical testimony, medical records, or some other method of proof—that supports his assertion that he passed out and fell because of a concussion that he sustained during the fight or that supports his allegation that Defendants' treatment was inadequate.   When asked during his deposition whether he had "any documentation or evidence that supports [his] belief that [he] had a concussion and that Defendants' action or inaction either caused [his] concussion or led to it not being properly diagnosed," he responded that he did not.   Wagle Dep. at 28.

The only medical evidence in the record that mentions a concussion is a report from a vascular surgeon whom Wagle saw in October 2019.   Resp. at 21.   Wagle saw the surgeon for a consultation on his vertebral artery dissection.   Id.   The surgeon's report stated that Wagle "was involved in a fight in March of 2019 where he sustained fractures to his eye and a syncopal episode the following day, as well as a severe concussion." Id.   As Defendants note, the surgeon assessed Wagle for the

14

first time about seven months after the fight and Wagle's fall.  See Miller v. Zaruba, No. 10 C 6533, 2013 WL 5587288, at *9 (N.D. Ill. Oct. 10, 2013) ("[L]ater findings are not necessarily indicative of whether a condition was serious at the time of presentment.").  This section of the report is also a summary of information about Wagle's history that was relayed to the surgeon, rather than the surgeon's own diagnosis.  It is unknown where this information originated, or whether Wagle reported this information.  Most importantly, nothing in the report suggests that Wagle passed out and fell because of a concussion.  It does not rule out plausible alternative explanations for why Wagle passed out and fell, and it does not rule out the possibility that, as Defendants note, Wagle sustained a concussion because of the fall.  Finally, the report does not discuss the effect of any delay in treatment for or diagnosis of the concussion.

Wagle offers no medical evidence confirming that he was in fact diagnosed with or treated for a concussion by providers at the hospital after the fall or thereafter.  In addition, there is no medical evidence that suggests that a concussion was a likely or even possible cause of him passing out and falling—or that those events were connected to the fight in any way.  Nothing in the record suggests that Wagle was harmed by Defendants' failure to treat or diagnose a concussion or links any aspect of Defendants' treatment to Wagle's fainting, fall, or the facial fractures and vertebral artery dissection with which he was diagnosed.  Nor has any expert testified to the care that Defendants provided, the inadequacy of that care, or any detrimental effect of that care.  And no medical expert has connected Wagle's alleged concussion to the symptoms he currently has.

Thus, while Wagle states that he passed out on March 6 "partly" due to a concussion sustained during the fight on March 5 that Defendants failed to diagnose or treat, see Wagle Dep. at 28, no doctor or medical evidence in the record has drawn that conclusion.

Other courts, examining similar claims in which a plaintiff received some treatment for visible injuries and did not put forth evidence suggesting that he or she was harmed by a failure to diagnose or treat a concussion specifically, have found that the plaintiff could not establish a serious medical need.[10]   For example, in <u>Haskins v. Sumulong</u>, a former prisoner alleged that nurses were deliberately indifferent to his medical needs after he sustained a concussion due to an assault by another prisoner.  No. 13-cv-8392, 2017 WL 1178223, at *1 (N.D. Ill. March 30, 2017).  After the plaintiff was assaulted, he remained conscious, correctional officers called for medical attention, and nurses arrived promptly to treat him.  <u>Id.</u> at *2.  The medical records noted that the plaintiff had a laceration on the right side of his head.  <u>Id.</u>  A nurse cleaned the affected area, applied

---

[10] <u>See</u> <u>Johnson v. McNeil</u>, 278 F. App'x 866, 871 (11th Cir. 2008) (affirming grant of summary judgment in part because plaintiff presented no evidence to demonstrate that a physician would have diagnosed Robert's head injury based on the symptoms that he presented to defendants at the time of the challenged conduct); <u>Al-Zerjawi v. Kline</u>, No. 4:15CV2512, 2017 WL 9674574, at *5 (N.D. Ohio Dec. 19, 2017) (finding that plaintiff could not prevail on his claim that prison medical staff were deliberately indifferent to his alleged concussion when he had not put forth evidence showing how he was harmed by the treatment he received or what different treatment would have done for his concussion); <u>Douglas v. Dep't of Corr.</u>, No. C14–5507 BHS, 2015 WL 4394877, at *7–*8 (W.D. Wash. July 16, 2015) (granting defendants summary judgment in part because plaintiff provided no evidentiary support to show that defendants provided inadequate care by failing to properly treat his concussion); <u>Miller</u>, 2013 WL 5587288, at *10 (finding that defendant's treatment of plaintiff, who alleged that he sustained a concussion due to a fight with other prisoners, was not deliberately indifferent when plaintiff offered no evidence that any problems from which he suffered related to the defendant not putting him on "neuro check" for a concussion after the fight); <u>Wilkins v. Ramirez</u>, 455 F.Supp.2d 1080, 1110 (S.D. Cal. 2006) (finding that plaintiff's unsworn allegations that he sustained a head injury due to an attack were insufficient to create a genuine issue of material fact when viewed against the documents and medical records that Defendants submitted, which showed that plaintiff suffered minor injuries, such as abrasions and cuts, and that he was taken to the healthcare unit immediately after the incident for medical evaluation and treatment); <u>see also</u> <u>Burk v. Runk</u>, No. 1:19-cv-01358, 2021 WL 6126233, at *4 (M.D. Pa. Dec. 28, 2021) (finding that failure to refer plaintiff to a concussion specialist may at most imply medical malpractice but was insufficient to support an Eighth Amendment claim because plaintiff's claim was based on "mere disagreement as to proper medical care") (punctuation modified); <u>Chasteen v. Jackson</u>, No. 1:09–cv–413, 2011 WL 797404, at *5 (S.D. Ohio Feb. 28, 2011) (finding that failure to diagnose concussion may be negligent but did not rise to the level of medical mistreatment under the Eighth Amendment).

antibiotic ointment, and covered the area with medical gauze, while another nurse administered a tetanus shot.  Id.  The plaintiff alleged that the nurses should have identified a concussion, warned him of the dangers that a concussion might present, and provided him with pain medication.  Id. at *4.

In discussing the objective element of a deliberate indifference claim, the court noted that, while a concussion may constitute a serious medical need, the record was "devoid of any evidence that any treating physician ha[d] linked the nurses' purported failure to promptly diagnose or treat a concussion to [the plaintiff's] current symptoms."  Id. at *6.  It emphasized that, while the plaintiff asserted that his current symptoms were due to a concussion he sustained during the assault, no medical evidence supported that conclusion.  Id.  Thus, the court found, "[w]ithout more, [the plaintiff] ha[d] not shown that he had a serious head injury requiring treatment."  Id.

Similarly, Wagle received prompt treatment for visible external injuries, and he has not connected any failure by Defendants to diagnose or treat his concussion to his injuries.  Without any medical proof that could create a factual dispute that Defendants' treatment was inadequate to address his condition or pain, Wagle's claim fails under the delay-of-care standard.

In sum, Wagle has not shown on the record before the Court that there is a factual dispute as to whether he displayed obvious signs of a concussion to Sattler and Magda or whether there was a detrimental effect of any delay in care.  Therefore, he cannot satisfy the objective component of his claim under either method.

### 2.  Subjective Component

Even if Wagle had established a serious medical need, he has not created a triable issue as to the subjective component of an Eighth Amendment violation.

17

The Court addresses the subjective component as to Sattler and Magda in turn.  See Rouster, 749 F.3d at 447 (explaining that each defendant's subjective knowledge should be assessed separately).

### a.  Sattler

The record does not contain enough evidence to support a finding that Sattler recklessly or intentionally disregarded a known serious risk to Wagle's health when she did not ensure that he was evaluated by a physician or place him under observation.  Sattler and Wagle interacted once, about 30 minutes after the fight, when Sattler evaluated Wagle in the healthcare unit.  As noted, Wagle testified that he presented to Sattler with a bump on his face and other cuts.  Sattler did not disregard these injuries.  She provided what appears to be proper treatment when she cleaned the affected areas, provided dressings, and gave Wagle patient education.  There is no indication that she knew or suspected that Wagle may be suffering from symptoms indicative of a concussion or other serious medical condition and yet failed to act.

Facing a similar lack of evidence in cases in which plaintiffs alleged a failure to adequately treat a concussion, courts have determined that plaintiffs could not show that the defendant acted with a sufficiently culpable state of mind.  For example, in Haskins, the court granted summary judgment after finding that nothing indicated that "the defendant nurses knew or even suspected that [the plaintiff] might have had a concussion."  2017 WL 1178223, at *6.  Further, the nurses examined and treated the plaintiff, and the evidence did not suggest that, while doing so, they disregarded the plaintiff's complaints about his head.  Id. at *6.  In addition, nothing indicated that the nurses' treatment of the plaintiff's documented injury, the laceration on his head, "departed from accepted nursing judgment, practice, or standards."  Id. at *7 (noting that nurses promptly responded to request for treatment and treated the laceration by cleaning the area and applying

ointment).  Accordingly, the court found that no reasonable jury could find that defendants acted with deliberate indifference.  Id.

In a similar manner, the court in Harris v. Nielsen determined in granting summary judgment to a defendant LPN that the plaintiff, who alleged that he sustained a concussion when he was assaulted in prison, could not establish the subjective component of his claim.  No. 09–2982, 2010 WL 2521434, at *6 (D.N.J. June 15, 2010).  The defendant LPN provided the plaintiff with prompt treatment for visible facial and head injuries that the plaintiff sustained during the assault.  Id.  The plaintiff, however, contended that the defendant did not examine him for a concussion, did not check his face for facial fractures, failed to provide him with aspirin and ice, and should have referred him to a physician sooner.  Id.  Presuming without deciding that the plaintiff's concussion constituted a serious medical need, the court explained that the defendant's alleged failure to take steps to be sure the plaintiff had not sustained a concussion, conduct a more thorough examination, or refer the plaintiff for immediate care did not rise to the level of a constitutional violation.  Id.  The court noted that the defendant examined the plaintiff after the assault and determined that he did not need urgent care, and it found "nothing about the medical care provided . . . indicate[d] that she was deliberately indifferent to Plaintiff's potential concussion."  Id. at *7.

Here, Sattler likewise evaluated and treated Wagle after the fight.  No evidence suggests that the care was improper or that, when she rendered the care, Sattler perceived facts from which she could have inferred that Wagle faced a substantial risk of a concussion or other serious harm and disregarded that risk.  And Wagle does not offer evidence suggesting that Sattler considered an alternative, more serious diagnosis but refused to verify that Wagle's symptoms were consistent with such a condition.  See Rouster, 749 F.3d at 449 (finding that defendant's failure to call a physician in response to plaintiff's complaints did not show deliberate indifference when there was

no evidence that defendant knew that plaintiff was suffering from a serious ailment and, instead, interpreted his symptoms as indicating a different condition, for which they provided appropriate treatment); Winkler, 893 F.3d at 892–893 (finding that defendant was not deliberately indifferent when the record showed that defendant provided treatment addressing what he believed to be the actual risk to the plaintiff's health); Briggs v. Oakland Cnty., 213 F. App'x 378, 385 (6th Cir. 2007) (finding no deliberate indifference where the nurse "perceived a lesser risk of serious harm to [the inmate's] health" than what he was actually suffering from and "acted under that belief"); Porter v. Bunch, No. 16-cv-5935, 2019 WL 1428431, at *10 (S.D.N.Y. March 29, 2019) (finding plaintiff's untreated concussion symptoms did not meet subjective component of analysis where plaintiff did not allege his symptoms "looked like such that [defendants] would be on notice that [plaintiff's] injuries were severe").

In addition, Wagle's allegations that Sattler should have provided different or additional treatment by referring him to a physician or placing him under evaluation are insufficient to demonstrate that she acted with deliberate indifference. "[A]llegations that more should have been done by way of diagnosis and treatment and suggest[ions] of other options that were not pursued raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim." Rhinehart, 894 F.3d at 741 (punctuation modified); see also Dodson v. Wilkinson, 304 F. App'x 434, 440 (6th Cir. 2008) (explaining that a plaintiff's "disagreement with the testing and treatment [he or she] has received . . . does not rise to the level of an Eighth Amendment violation"); Winkler, 893 F.3d at 893 (finding that, when defendant physician did not have a reason to suspect that plaintiff was suffering from a different, more harmful condition, defendant's decision not to investigate further into what was causing plaintiff's symptoms might have been negligent but did not show that defendant consciously exposed plaintiff to a risk of serious harm).

Wagle has not presented sufficient evidence from which a reasonable jury could find that Sattler was subjectively aware that Wagle suffered from a concussion or other serious condition and chose to ignore his need for treatment.

### b. Magda

The record also does not permit the conclusion that Magda acted with a reckless disregard of a substantial risk of serious harm to Wagle.  As noted, the parties offer different accounts of Wagle's interaction with Magda.  According to Wagle, he presented to Magda with a purple and swollen left eye and told her that he had been "beat up by a couple of guys earlier today" and that his face hurt, that he felt dizzy, and that he "didn't feel right."  Wagle Dep. at 22.  In response, Magda, an LPN, told him to fill out a kite.  In contrast, according to Defendants, Magda assessed Wagle at the same time as Sattler and did not see him on the evening of the fight.  Mot. at PageID.439–440, 446–447.

Regardless of when Wagle and Magda interacted, neither account shows that Magda was deliberately indifferent in failing to place him under evaluation or examine him.  If Magda evaluated Wagle with Sattler after the fight on March 5, there is again no suggestion that she suspected that he faced a serious risk of harm.  If she provided Wagle his medication on the evening of March 5, the fact that she instructed Wagle to fill out a kite requesting medical attention for his symptoms is not indicative of deliberate indifference, and it does not establish that she believed him to be exhibiting a serious medical need, as opposed to a relatively minor condition.  Wagle's symptoms alone would not have presented an obvious "excessive risk to inmate health or safety" sufficient to infer subjective awareness of the risk.  See Boyce v. Moore, 314 F.3d 884, 890 (7th Cir. 2002) (explaining that plaintiff's swollen eyes "would not present evidence of an obvious excessive risk to [plaintiff's] health sufficient to infer knowledge" of the risk).

The Court finds that the evidence is insufficient to create a material factual dispute as to whether Defendants acted with a sufficiently culpable state of mind.[11]

In sum, Wagle has not presented evidence from which a jury could find that Defendants were deliberately indifferent to his medical needs by failing to provide treatment for his alleged concussion.  Therefore, Defendants are entitled to summary judgment.[12]

### III. CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Dkt. 69).

SO ORDERED.

Dated:  March 31, 2023                                    s/Mark A. Goldsmith
              Detroit, Michigan                              MARK A. GOLDSMITH
                                                                      United States District Judge

---

[11] Wagle requests that he be permitted to amend the complaint if he has misidentified Magda as the person who delivered his medication on the evening of March 5, 2019.  But the identity of the person is irrelevant, given that Wagle has not shown that any conduct was actionable.  Amendment would be futile.  See Calkins v. Midland Funding NCC-2 Corp., 412 F. Supp. 2d 699, 702–703 (W.D. Mich. 2006) (finding that motion to amend complaint was futile because, even if the court were to grant the motion, it would not affect the analysis of the summary judgment motion).

[12] Because the Court finds that Defendants are entitled to summary judgment on the ground that Wagle cannot establish an Eighth Amendment violation, it need not address Defendants' arguments that they are entitled to qualified immunity because they did not violate a clearly established constitutional right or that they are entitled to sovereign immunity on the official capacity claims asserted against them, insofar as Wagle seeks monetary damages.